The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. Edward Canty III, appeal number 202187 and United States v. Malkan Jordan, appeal number 21-1327. Attorney Hite, please introduce yourself for the record and proceed with your argument. Yes, thank you. My name is Julia Hite and I represent the Appellate Court. Ms. Hite, Ms. Hite, we can see your mouth. Could you? Okay, now we can see your face. Thank you. All right. Given the time constraints in this case, I will focus my argument on the ineffective assistance of counsel claim. Now, before addressing the many errors made by child counsel, it is understood that given the absence of objections to each and every error that we are claiming, this court is restricted to employing the plain error standard rather than the lesser standard of the abuse of discretion. What we suggest for the purposes of this Sixth Amendment claim is that using the plain error standard no doubt relegates Jordan to a harsher standard of proof and this should be considered as collateral damage to counsel's failure to object during the trial. Therefore, we urge that this court should consider the issues made, especially those in the summation, as under both standards, the plain error and the abuse of discretion standard, so that if this court concludes that under the abuse of discretion standard the errors were worthy of reversal, then that should be applied to the argument of ineffective assistance of counsel and should bolster our argument considerably in finding ineffective assistance of counsel. This court has an established practice of not hearing ineffective assistance of counsel claims on direct review unless those claims have been first raised in the district court. What is there about this case that would warrant us in departing from that well-established practice? Well, Your Honor, I will endeavor to show that the errors here were not tactical and were highly prejudicial in the context of this case. However, I do understand that this court has a practice as repeated in many of its decisions that it will not consider the effective assistance of counsel argument on direct appeal. What I would suggest in the alternative, if this court finds some of these issues meritorious, and I suggest that they are, that this court take the remedy which is available to it, as indicated by the government's brief, of remanding the case to the district court so that the district court would assign Melkin Jordan, counsel, to represent him on his claim of ineffective assistance of counsel. Otherwise, there's a double whammy. He's lacking, supposedly, ineffective assistance of counsel at trial, and then you're sending him back to fend for himself by submitting pro se a habeas corpus issue? No, that's not true, Ms. Hoyt. We have, in many cases, said that ineffective assistance of counsel claims should be raised that weren't raised originally in the district court, should be raised on collateral review, and we have, when we think it's proper, directed the district court to appoint counsel in connection with those claims. That's what we've done to avoid what you refer to as a double whammy. Well, that's exactly what I'm asking for, Your Honor. No, that's not what you're asking for. You're asking for us to hear this on direct review, not to decide the appeal and leave ineffective assistance of counsel for collateral review, which is our normal practice. Well, Your Honor, Ms. Hoyt, if I understood you, you, as an alternative to us deciding it, are quite agreeable to a remand for an attack on collateral review. What concerns you is the instruction from this court to appoint counsel, and you think that because it's discretionary with us that if you make a showing of some possible merit, that you are more likely to get ineffective assistance of counsel claims disposed of with court-appointed counsel. Is that it? That is absolutely it, Your Honor. All right. Are you then giving up on the merits of this? No, Your Honor. I'm going to proceed to the merits at this point, the particular errors that were committed. Now, in assessing these particular errors, what the government primarily claims is that these were all tactical errors by counsel and not a deficient performance of Sixth Amendment standards. The government also insinuates, and I think it could be rejected outright, that the motivations of counsels in failing to object was so that Melkin Jordan would have a better shot at this appeal, i.e., by me raising this issue. I think that that issue should be taken out of the case, or that insinuation should be removed from the case immediately because I don't think So what is your strongest ineffective assistance claim? Well, I think that all the issues are strong. My co-counsel is going to be addressing the summation argument in full, but I would suggest that the summation arguments, I mean, if you look at them, I mean, what the government did here was inflammatory and prejudicial with respect to four separate arguments. The defendant should go to jail because the government witnesses went to jail. The defendants are responsible for the drug plague in the state of Maine. I mean, these defendants are not being tried in a Purdue case. They're being tried in a simple one-count conspiracy case. Ms. Hite, one can be dismayed by the comments from an experienced prosecutor. On the other hand, the failure of experienced defense counsel to object certainly suggests that they didn't think any real harm was going on. So could you please respond to that? Well, Your Honor, I cannot see that they felt that no harm was being done. I think the better inference, given the nature of these remarks and the fact that this court has previously condemned such remarks and the district court found that such remarks were prejudicial, so I would contend that this was just a lapse in counsel's representation. Okay, I have one other question for you. The other side of that coin is, if it was such an overwhelming case, why did the prosecutor repeatedly make improper comments? Do you have anything you'd like to say about that? Yes, Your Honor, because I really think that in this case, given Osborne, who was going through withdrawal and we asked for a competency hearing, but I'm not going to have time to go into this, and the fact that all of the government's witnesses, five of them, were permitted to testify at length to their drug addiction, how they used the drugs, how they prepared the drugs, the awful state and sickness they exhibited. They were able to use these witnesses, these live witnesses, five witnesses and Osborne, as visual aids, as exhibits, as prime exhibits, as to how damaging... Okay, I have it. Thank you. My time is up? Yes. Oh, wow. Okay, thank you. Thank you, Attorney Hite. Please mute your audio and video at this time. Attorney Raseel, if you could introduce yourself on the record to begin. Good morning, Your Honors. Luke Raseel for Edward Canty, and may it please the Court. I'll try and pick up where the argument left off with Attorney Hite, and that's with the four types of improper remarks that the prosecutor made during the summation. The guilt by association, the invoking the prestige of the government, three years of hard, compassionate work by these agents had already found an overarching conspiracy, casting the jury as the consciousness of the community by referring to the suffering of many Mainers and the callousness of the defendants, and also arguing evidence not admitted against Mr. Canty, saying that they'd help you put a tourniquet on your arm. And in evaluating these arguments and having in mind that there were no objection to them, still the trial judge found that these arguments satisfied nearly all the prongs of plain error analysis and of the miscarriage of justice analysis, save for that strength of the evidence prong. And I think picking up on Judge Lynch's question about if the evidence was as strong as the trial judge eventually said it was in the Rule 33 order, why then would the government resort to these arguments? I would suggest the evidence was not that strong on the relevant question of whether there was an overarching conspiracy. And of course, it's understandable under those circumstances where their star witness, Lawson, decides to take the fifth surprisingly in front of the jury, and the case really isn't coming in as strongly as the government had hoped, that there'd be an incentive to take these liberties during the summation. But, of course, that doesn't provide any justification for taking them. I'm sorry, Judge Sell, you proceed. Counsel, what is our standard of review as to the district court's finding that these missteps in final argument were harmless? It's hard for me to say exactly, Judge Selya. The case I would point to there is Penigua-Ramos, 135 F. 3rd, 193, where they said the trial court's findings on the prejudicial effect of unpreserved error are entitled to deference. But on that miscarriage of justice analysis in the final part of the analysis about the strength of the evidence, the Penigua-Ramos case does not suggest that this court owes much deference to the strength of the evidence finding that the lower court made. But isn't the finding of harmlessness really a finding on the third prong of plain error, not on the fourth? I understand that Judge Levy seems to have confused the plain error analysis, but I would think the finding of harmlessness was entitled to deference because it is in reality a finding on the issue of prejudice in this particular case. I would say two things on that, Judge Selya. One relevant question here is, which of the judges' findings is due deference? Because at the time of trial, when the parties were laser-focused on the relevant issue, was there an overarching conspiracy? And when the judge was obligated to take all inferences in the government's favor, that's when the judge characterized it as a very close call. And I think under Ariadna-Agrassat, when it comes to the Rule 33 analysis, it's a different standard. You don't take the evidence in the government's favor, and you don't assume the credibility issues would have been resolved in the government's favor. Instead, you look at the evidence as a whole. Mr. Rasil, if I may, I think the overall standard after Greer on plain error is whether there was a reasonable probability the jury would have reached a different outcome. What reasonable probability means may be up in the air. But that's the standard that is actually a little different than the way the First Circuit has recited it. But let's take that as a governing standard. The trial judge here found the first three prongs of plain error to be met. And I understand you to be arguing that the final prong, miscarriage of justice, is a necessity, always something subject to de novo review. Now I want to drill down into your argument. And that has to do with your assertion that the evidence was sufficiently close as to an overarching conspiracy because the evidence was weak as to interdependence and as to overlap. Now, could you address those? Yes, and I'll focus principally, I think it was weakest as to interdependence. And what we're lacking here are sufficient indicia of interdependence. There were no consolidated brands of drugs. There were no established rules. There were no managerial meetings. There was no storing weapons and drugs at one location separate and apart from where retail sales take place, as would connote some type of coordination. There were no hired task-specific employees. This was much more a matter of happenstance. This is what you would expect to happen if out-of-town drug dealers come into a location where there are heroin-addicted people willing to do whatever is necessary and convenient to get personal use heroin for themselves. It doesn't take any coordination at all to achieve that. I'm sorry. Let me ask you about your happenstance argument and lack of coordination. It seemed the evidence was pretty direct evidence that they were each selling drugs. And I can see your happenstance if that's all it was, but didn't the evidence show that all three of them ended up over time selling out of three different apartments? That is correct. That seems hard to attribute to happenstance. Perhaps showing up in one department together could be a coincidence, but then the same three guys with the same runner end up in another apartment running a similar operation, and then yet a third apartment. That just doesn't happen without them coordinating with one another, does it? I mean, I think it very well could, Your Honor. There's two things I would say on that. One is when there are a community of addicted people there in Portland, which it appears there was. Mr. Osborne was very well woven in this community. Word gets out without the need of careful coordination. Tweedy is in need of personal use heroin, and her apartment is available if you can supply that. How did the three of them all end up in the same three apartments? I think from word of mouth, it very well could have been in the community there that these people were willing to allow drug dealers in. I think probably Osborne would have been instrumental in spreading this word. But, of course, that doesn't mean the dealers are coordinating among each other. And the case that I bring to the Court's attention on this issue is a Third Circuit case, United States v. Pressler, which I cite on the sufficiency issue, where two alleged co-conspirators lived in the apartment together that was rented by one of them. They shared a heroin supplier. They shared their customers. One co-conspirator occasionally bought from the other, and they would sell in each other's absence. And still, the U.S. Court of Appeals for the Third Circuit held that was not enough interdependence to prove a conspiracy between them. And so for all of those reasons, we would say that the evidence was insufficient under the Rule 29 standard, and a judgment of acquittal should enter for that reason. But certainly, at the very least, it was a close call under the Rule 33 standard, and we should get a new trial. Mr. Russell, was there any evidence that they were competing with each other, the drug dealers who sold from common locations? Yes, there was judgment. At Santiago's apartment, Santiago had a romantic relationship with Jordan, and Santiago was asked by the prosecutor, Now, when Jordan would leave to get more heroin, would he then want other of the dealers selling in his stead? And Santiago was adamant, no. When Jordan wasn't there, he did not want anyone else dealing out of my apartment. I had to do that behind Jordan's back. And in fact, Jordan would argue with Lawson and tell Lawson, leave. I don't want you dealing here. And Lawson would just obstinately refuse to leave, and there was no evidence that that ever abated. Was there any evidence that Jordan prohibited Canty from selling from that apartment, and then you have the other two places you have to deal with? That's certainly true. I think the best evidence of competition among the dealers was that Jordan said across the board, not specifically to Canty or to Lawson or to Cruz, but across the board, Jordan told Santiago, I don't want anyone dealing out of your apartment in my absence. And I think when the judge was focused at the end of trial on this overarching conspiracy issue, which was the Rule 29 argument, he got it right. This was, at best, a very close call on the overarching conspiracy. And when you look at it against the other cases where a new trial was awarded, despite strong evidence, that Arrieta Argasot case, the crew members were on board with almost 12,000 pounds of marijuana, and it reeked of marijuana, and still, this court held the evidence was too weak to prevent the need for a new trial. That being the case, we would ask for a judgment of acquittal, but in the alternative for a new trial. Okay. Any further questions from my colleagues? No? No. Thank you. Thank you, Attorney Rocio. Please mute your audio and video at this time. Attorney Block, please introduce yourself on the record to begin. Yes. Good morning, Your Honors. Benjamin Block on behalf of the United States. I would like to address the strength of the evidence that Mr. Rocio was discussing here, because there was ample evidence of interdependence between these drug dealers. As Judge Kayada pointed out, the fact that they moved in tandem from one location to another, to another, is highly suggestive of a working collaborative relationship rather than mere happenstance. And there's direct evidence of... Before you move on from that, there were reasons that they had to move, correct? Government raids on one house, the arrest of the person who owned the apartment or at least rented it. So then they have to find a new place. They could. Your brother suggested that because of one of the guys who bought drugs from Osborne, that he was an easy source of information about other people who had apartments, who were willing to let drug dealers there, provided they got some drugs in exchange. All right. So beyond the mere fact that they end up in the same apartment, what's the evidence of coordination? Well, the evidence was that Jordan reappeared in Maine in 2015 and went to Osborne and his sister, Jessica Tweedy. And he says to Osborne, you know, let's start making money. And from that point on, Osborne is working with Jordan. Jordan brings in Lawson by sending Osborne to Lawson for drugs. Lawson and Jordan then coordinate with Osborne to take over the Oak Street apartment. They bring in Akeem Cruz, who brings in Canty. And Canty helps Cruz punish Osborne for misusing the heroin. Lawson is involved in coordinating that. OK. So Cruz has to be the link. Cruz is definitely the link between Jordan and Lawson on the one hand and Canty on the other. Well, I'm concerned mostly about Canty. So tell us more about Cruz, because I thought Cruz and Canty were friends independently. And that's why Canty helped beat up someone who had cheated on Cruz. Correct. That person was Osborne. And that was Osborne's introduction to Canty. Following that incident, Canty begins dealing out of the Oak Street apartment with Lawson and Jordan. Cruz is supplying heroin to the apartment lessee Lombardi to sell on Cruz's behalf. So they all have drugs in that apartment. They all are using Osborne to work the door as a lookout to recruit customers. OK. Are the sales simultaneous while Osborne is the lookout, or are they there at different times? Osborne testified that they were all there dealing at the same time. He also explicitly testified that Lawson and Jordan would take turns as the customers arrived. Tie it to Canty. On page 236 of Canty's appendix, he testifies that Canty sold from Oak Street at the same time as Jordan and Lawson. And I believe on page 428 and 429 as well. OK. That's a bit ambiguous as to what it means, but... It could be considered ambiguous, but I think that when you consider it in context of the other evidence, that Canty and Jordan both stored drugs at Red Bank, that Canty and Cruz sold side by side out of Red Bank, that Jessica Tweedy would drive Jordan and Canty, that when Jordan was out of town, they would bring Canty in to fill the role. OK. And one of the things that Canty argues is that there really was no benefit that the others derived from Canty happening to sell, happening to use their term, to sell drugs from the same locations or to store drugs. He obviously didn't use them to obtain drugs from New York City. He went down on his own. Right. And there is absolutely no evidence of conversations between Jordan and Canty of any agreement. It doesn't have to be explicit. You can infer it if there's enough evidence to allow the inference. So what's the benefit that the others get out of Canty having a four-month period overlapped in the same sales locations? Well, I would say two things. One, I would say that they clearly all understood that by pooling their efforts, that they were drawing in more customers than they otherwise would. They were benefiting from the ability to share the runners and Osborne as a recruiter. And so I think they all realized that benefit. But I think perhaps the better way to look at it is what did Canty derive from his association with these individuals? Clearly, they were aware of Canty. They were aware that he was dealing from these locations and storing drugs there. Canty's benefit as a relative outsider in this, Jordan was the one who knew Osborne. Osborne was the one who knew all of the customers. Canty, who comes in without preexisting relationships, is introduced to this world in which he has a preexisting customer base. He has ready-made runners to traffic his drugs for him. And so by entering this group and taking advantage of this collaborative effort that was underway, he derived incredible benefit from being allowed to participate in that. Well, you'll admit this case is a far cry from our Nieves decision. It seems to me the government's extending Nieves is quite a lot here. So the test in the government's mind becomes whether the defendant derives any benefit regardless of whether anybody else does. And that supports a conspiracy. Is that correct? Well, I think it is a flip side of the same coin. The other dealers certainly used Canty for muscle, which was a benefit to them. Not the other dealers, one. Cruz used him for muscle. Lawson helped them find Osborne on that occasion in order to punish him. Jordan's the only one as to whom there's no evidence regarding his involvement in that incident. And again, I think by the fact that he was permitted to store drugs in the same locations, that they sold from different locations from where they were storing their drugs. They're moving in tandem. I'm sorry, permitted? I thought it was the owners of the apartments and not the, who are themselves drug addicts, and not that there was a strong-armed drug dealer who controlled everything. I didn't mean to imply that there was. I meant permitted in the sense that certainly Jessica Tweedy allowed him to store drugs at Red Bank. She allowed others to store drugs at Red Bank. They all, several of them, slept at Red Bank. And from that, they're moving to other apartments around town to sell drugs together. I think that it's permissible for the jury to infer. That may be, but what concerns us are the poisoning the well comments from the U.S. attorney in Maine who was an experienced prosecutor. This was not a neophyte. And so one assumes there was some purpose behind the improper comments. I appreciate Your Honor's interpretation. I think that she certainly is an experienced prosecutor. These comments were regrettable. We have taken steps to address them. Five minutes remaining. I don't think that that is necessarily correct to suggest that these statements were intentionally made with an effort to inflame the jury or otherwise persuade them to convict on improper grounds. What other inference can we draw? I mean, they are inflammatory statements made by a prosecutor who obviously knew better. Yes, and certainly in hindsight, there's tremendous regret that these comments were made. I think we're not contesting in any way that these comments were improper. I would simply say that I don't think it's necessarily fair to infer that they were that they were intentionally inflammatory. This was a at the end of trial. This was in rebuttal in response to just strong closing arguments from defense counsel. And certainly in some respects, overstepped the line and certainly should not have been made. But as as for them being purposeful, I don't think that that's necessarily I don't think that's a necessary inference from the record. It's a common parlance in Maine, isn't it, to deride someone as being from away. And yet the stress here is not only are they from away, they're from New York City. And they're bringing their drug problem up to Maine. It's a little bit hard to see that those aren't purposeful comments. Do you draw a distinction between the strength of the evidence against Jordan versus Canty? I think the district judge did an excellent job in analyzing the evidence in his Rule 33 order. And certainly, certainly the evidence as to Jordan is fairly described as overwhelming. I think I think the district judge appropriately characterizes the evidence against Mr. Canty as strong and and that the jury had no true alternative but to convict Canty based on the evidence in the record. And I think that finding from the judge who sat through the trial observed the witnesses observed the evidence and also observed the closing arguments and and heard the statements from the prosecutor was able to to judge their potential impact on the jury. And clearly at the moment, neither the district judge nor the defense attorneys thought that something was happening that was egregious. Mr. Blatt, you've represented the United States well. I do have a question about the plain error test. If we take the trial judge at his word that these comments prejudiced the defendants, let's focus on Canty. And we take it as a given that the fourth prong of plain error has to be interpreted differently than the third prong. A third prong finding doesn't automatically get you a fourth prong finding. So as to the fourth prong, is there a law on whether an appellate court reviews that de novo or deferentially? So I also struggle to find the answer to that question. I would suggest that deference is appropriate here because we are talking about the application of the prejudice finding to the trial evidence. And the district court is certainly best suited to make that evaluation. But I don't I was not able to confirm that in case law. OK, thank you. That's time. Thank you. We would request that this court affirm the convictions. Thank you at this time. Attorney Block, please mute your audio and video and counsel for the first case can leave the leave the meeting at this time. That concludes arguments in this case.